AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire



In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

72 WHITTEMORE ROAD, LONDONDERRY, NEW HAMPSHIRE 03053

)
)
)
)
)
)

Case No. 21-mj-15-01-AJ

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, which is attached hereto and incorporated herein.

located in the _____ District of _____ New Hampshire _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(6) | False Statements in Acquistion of a Firearm |
| 18 U.S.C. § 922(g)(3) | Possession of a firearm by an unlawful user of a controlled substance |

The application is based on these facts:
See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Patrick Dawley
*Applicant's signature*

Patrick Dawley, ATF, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

**Telephonic conference**   *(specify reliable electronic means).*

Date: __Jan 19, 2021__

_____
*Judge's signature*

City and state: __Concord, New Hampshire__

Andrea K. Johnstone, U.S. Magistrate Judge
*Printed name and title*

SEALED DOCUMENT

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 72 Whittemore Road,

Londonderry, New Hampshire 03053, hereinafter "PREMISES," further described in Attachment

A, for the items described in Attachment B, including a silver Apple iPhone (unknown model)

smartphone (hereinafter, "Telephone 1"), and a pink and gold Apple iPhone (unknown model)

smartphone (hereinafter, "Telephone 2").

2.      The applied-for warrant would authorize the forensic examination of the seized

electronic equipment for the purpose of identifying electronically stored data particularly

described in Attachment B.

3.      I am a Special Agent with the United States Department of Justice, Bureau of

Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF"), and have been since February

of 2019. I am currently assigned to the Manchester, New Hampshire Field Office in the Boston

Field Division.  While training to become a Special Agent, I attended the Federal Law

Enforcement Training Center (hereinafter, "FLETC") in Glynco, GA full-time for six-and-a-half

months. During my time at FLETC, I received training in practices and methods of illegal

firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an

ATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department for

approximately seven years. As a Special Agent and Police Officer I have conducted and/or

participated in a number of investigations involving state and federal firearm and controlled

substance violations. I have interviewed multiple victims, sources of information, witnesses,

suspects and defendants regarding various types of criminal activity. I have also served search

warrants for various crimes and have made criminal arrests for firearm and controlled substance

violations. I participated in state and federal investigations involving possession of illegal

weapons including firearms, improvised explosive devices and possession of controlled

substances. I also conducted numerous investigative stops and probable cause searches of people

and vehicles. I participated in physical surveillance operations and participated in the execution

of state and federal arrest warrants.

    4.    Based on my training and experience, I am aware that drug users, commonly use

cellular telephones to communicate and further their drug activities. I am familiar with the

manner in which drug users use telephone, coded, veiled, or slang-filled telephone conversations

when discussing their illegal business, in an effort to further prevent detection, and that they

often use text messages in lieu of phone calls to avoid speaking over the telephone.

    5.    I am familiar with the facts and circumstances of this investigation from my own

personal participation and from oral and written reports given to me by other members of law

enforcement. Since this affidavit is being submitted for the limited purpose of establishing that

probable cause exists to support the issuance of a search warrant, I have not included details

about every aspect of the investigation. While this affidavit contains all the material information

2

I am aware of that is pertinent to the requested search warrants, it does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES

6.      Title 18, United States Code, Section 922(g) reads in pertinent part,

> It shall be unlawful for any person . . . who is an unlawful user of . . . any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm.

18 U.S.C. § 922(g)(3).  An unlawful user of a controlled substance is someone who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician, and unlawful use must have occurred recently enough to indicate that the individual is actively engaged in such conduct.  It is not required that such a person use drugs at the precise time that the person possesses a firearm.  27 C.F.R. § 478.11.

7.      Title 18, United States Code, Section 922(a)(6) reads in pertinent part,

> It shall be unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictions oral or written statement…intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or disposition of such firearm.

## PROBABLE CAUSE

### *Background*

8.      Along with other members of law enforcement, I am conducting an investigation of SHEHABELDIN into the illegal possession of drugs and firearms, to include illegally obtaining firearms as a prohibited person, due to being an illegal user of drugs.

3

9.      On November 14, 2020, SHEHABELDIN was arrested by the Manchester Police Department ("MPD") for resisting detention, disobeying a police officer and possession of a controlled drug. SHEHABELDIN had attempted to flee the scene a while operating a silver 2016 Nissan Altima, bearing New Hampshire registration 4309800, registered to SHEHABELDIN's father, Gamal Shehabeldin at PREMISES. MPD seized the following items from SHEHABELDIN's person: a tan Glock 19gen4 9mm pistol, bearing serial number ACAY593 (hereinafter, the "tan Glock 19gen4"), containing a loaded magazine with fifteen (15) rounds of 9mm ammunition, $534.00 USD currency, approximately 8.8 grams of suspected marijuana, Telephone 1, and Telephone 2.

10.     SHEHABELDIN posted bailed on November 14, 2020 after his arrest and was released from the Manchester Police Department. A state arrest warrant was issued on November 24, 2020 for SHEHABELDIN for Reckless Conduct, which was executed on December 1, 2020. SHEHABELDIN was in custody at the Hillsborough County Department of Corrections from December 2, 2020 until December 9, 2020, when he posted bail and was released.

11.     On December 10, 2020, SHEHABELDIN plead guilty and was convicted of possession of a controlled drug in Manchester, New Hampshire District Court.

12.     On January 6, 2021, at approximately 8:34 AM, I learned from MPD Evidence Technician David Dydo that Telephone 1 and Telephone 2 were released to SHEHABELDIN on or about December 29, 2020, at SHEHABELDIN's request.

13.     From the date of their seizure to the date of their return, Telephone 1 and Telephone 2 were stored in the MPD Evidence Vault.

4

### *NIBIN Lead*

14.     On November 20, 2020, I reviewed the National Integrated Ballistic Information Network (hereinafter, "NIBIN") Lead for Crime Gun #762-20-000756 for a 9mm luger shell casing (MPD Evidence Item #KK-7, per MPD Case #20-013934) which was recovered on October 24, 2020 at 3 Kitchens Bar and Grill, located at 333 Valley Street, Manchester, NH, after a shooting incident occurred where numerous shell casings of different calibers were recovered. The NIBIN Lead matched the aforementioned 9mm shell casing to the test fired 9mm shell casing (MPD Evidence Item #JMM01, per MPD Case #20-015013) from the tan Glock 19gen4, seized from SHEHABELDIN on November 14, 2020.

15.     Based on my training, experience, and interaction with firearms examiners, a NIBIN Lead is an unconfirmed (presumptive) potential association between two or more pieces of firearm ballistic evidence based on a correlation review of digital images in the NIBIN database. These potential associations are identified by either a firearms examiner or a trained NIBIN technician. There is a high probability that a microscopic comparison, by a firearms examiner, will confirm the association between the firearm ballistic evidence.

16.     On November 20, 2020, trained personnel from the ATF Boston Field Division Crime Gun Intelligence Center ("CGIC") identified a NIBIN Lead/Leads between the following 9mm cartridge cases:

      a.  MPD Case #20-013934, Evidence Item KK-7; and

      b.  MPD Case #20-015013, Evidence Item JMM01.

In layman terms, there is a high probability that the tan Glock 19gen4, seized from SHEHABELDIN on November 14, 2020, was the firearm used in the October 24, 2020 shooting

at 3 Kitchens Bar and Grill.

### *Lying on ATF Form 4473*

17.     I reviewed ATF eTrace #T20200449949 for the tan Glock 19gen4 and learned

that the firearm was purchased by SHEHABELDIN on December 3, 2018 from Shooters

Outpost, a federal firearms licensee, located at 1158 Hooksett Road, Hooksett, New Hampshire. I

reviewed a copy of the ATF Form 4473 and observed SHEHABELDIN filled out, signed and

dated the form on December 3, 2018. I observed SHEHABELDIN answered "No" to Question

11.e., which asks, "Are you an unlawful user of, or addicted to, marijuana or any depressant,

stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of**

**marijuana remains unlawful under Federal law regardless of whether it has been legalized**

**or decriminalized for medicinal or recreational purposes in the state where you reside."**

18.     I know through my training and experience that users of illegal drugs, to include

marijuana, who seek to obtain firearms will often knowingly answer "no" to questions regarding

drug use, in violation of Title 18 U.S.C. 922(a)(6), knowing that such an answer is difficult to

refute through the background check process, in order to obtain immediate possession of the

firearm for nefarious means, to include violent crimes and firearms trafficking.


### *State Search Warrant for a 2020 Nissan Altima*

19.     On December 1, 2020, SHEHABELDIN was arrested by MPD for the

aforementioned arrest warrant. While SHEHABELDIN was being transported to MPD, officers

observed SHEHABELDIN trying to discard or destroy a small unspecified amount of suspected

marijuana while in the back of the MPD Transportation Wagon. I know through my training,

knowledge and experience that the amount located was consistent with personal use amounts.
MPD seized the 2020 silver Nissan Altima rental vehicle, bearing New Hampshire registration
4753198, registered to EAN Holdings LLC, which SHEHABELDIN was operating at the time of
his arrest, pending a state search warrant. A state search warrant was obtained for the 2020 silver
Nissan Altima and executed on December 9, 2020. The search warrant yielded a tan Glock 19X
9mm pistol, bearing serial number BHXC921 (hereinafter, the "tan Glock 19X"),[1] a small
unspecified amount of suspected marijuana, which I know through my training, knowledge and
experience to be consistent with personal use amounts, and an Apple iPhone XS Max
(hereinafter, "Telephone 3"). MPD obtained a state search warrant to extract the digital evidence
and content contained within Telephone 3 and was executed on December 15, 2020 by MPD.

### *Historical Drug User by SHEHABELDIN:*

20.     I know through reviewing MPD reports, speaking with involved officers,
reviewing SHEHABELDIN's social media accounts to include Instagram, Snapchat and
Facebook and reviewing the content of Telephone 3, that SHEHABELDIN has regularly
consumed for numerous years and continues to consume marijuana.

21.     I am familiar with and able to identify SHEHABELDIN in photographs and
videos after viewing approximately hundreds of photographs and/or videos to include multiple
social media accounts belonging to SHEHABELDIN and/or associates, booking photographs
and photographs from the contents of Telephone 3. I am familiar with the numerous different

---

[1] A trace of the tan Glock 19X revealed that it was purchased from Merrimack Firearms LLC on 6/10/2019 by a
resident of Atkinson, New Hampshire.  I am not aware of any information linking the initial purchaser of this
firearm to DRS, and am not aware of how the firearm ultimately came into SHEHABELDIN's possession.

appearances of SHEHABELDIN to include varying hair lengths and styles, facial hair and other

accessories to include clothing, hats and face coverings.

22.      I reviewed MPD Report #17-005734, dated April 19, 2017, in which MPD

contacted a motor vehicle in which SHEHABELDIN was identified as a passenger. MPD

officers observed the strong smell of burnt marijuana emanating from the vehicle. A consent

search of the vehicle yielded rolling papers, a digital scale and marijuana seeds and stems.

23.      I reviewed MPD Report #17-016675, dated October 18, 2017, in which MPD was

dispatched for a group of individuals "smoking weed". As a result of the interaction, MPD

officers noted the strong smell of burnt marijuana, identified SHEHABELDIN as an involved

party and recovered marijuana from Michael CARTEGENA, within close proximity of

SHEHABELDIN, who was attempted to conceal the marijuana from MPD officers.

24.      I reviewed MPD Report #20-009118, dated July 20, 2020, in which MPD

conducted a motor vehicle stop of a 2013 black Dodge Dart, bearing New Hampshire registration

4475414, registered to Jessalyn Vargas of Manchester, New Hampshire, which was being

operated by SHEHABELDIN. SHEHABELDIN claimed Jessalyn Vargas was his step-sister. As

a result of the stop, which was recorded on MPD body cameras, SHEHABELDIN consented and

produced a container of Boutiq Kush Mint Hyrid THC edibles. SHEHABELDIN admitted to

officers, that the mints were "like marijuana", which I knew through my training and experience

to mean to contain THC and defined as an illegal controlled substance under Federal law. MPD

officers opened the container and observed it to contain marijuana and that the container did not

contain THC edibles. SHEHABELDIN admitted to regularly consuming marijuana. During the

interaction, SHEHABELDIN was found to have a Smith & Wesson M&P .40 caliber pistol,

bearing serial number HPL5097,[2] with a loaded magazine containing nine (9) rounds of 9mm controlled-expansion tipped ammunition, commonly referred to as "hollow-points". The firearm was seized as contraband based upon SHEHABELDIN's statements of being a drug user.

25.     On December 16, 2020, I reviewed the public postings of the Instagram account of SHEHABELDIN, under the username "@drs_ghost". I know through conversations with the MPD Gang Unit that SHEHABELDIN's nickname or street moniker is "Ghost". I observed the following public posts to include:



a.  Posted December 19, 2017 – SHEHABELDIN holding a suspected AK-variant pistol, commonly referred to as a "draco", with a magazine as well as visible smoke in the air surrounding SHEHABELDIN;

---

[2] The Smith & Wesson pistol was traced to James L McLoud & Sons Manchester Firing Line Range, a Federal Firearms Licensee who is no longer in business. Additional information on the firearm was not found within available records.

9



b.  Posted on January 1, 2020 from the Instagram account "@drs_page" and by
    "@drs_ghost" on March 8, 2020 – SHEHABELDIN smoking suspected
    marijuana based upon my knowledge, training and experience of the manner in
    which the individuals, to include SHEHABELDIN, are holding the suspected
    marijuana, blowing the smoke, being in a social setting and consuming alcohol
    which I know is often when marijuana is consumed as well, as well as being
    indoors. I know people who smoke marijuana often do so indoors to conceal the
    odor from law enforcement detection. Cigarettes and cigars are often
    commercially manufactured and packaged, in which containers and the distinct
    identification of a cigarette would be readily identifiable versus a suspected hand-
    rolled marijuana cigarette. I know that through SHEHABELDIN's and his
    associates' social media posts, that when they consume tobacco it is typically
    consumed through the utilization of a hookah, in which an individual inhales

through a tube with a mouth piece, instead of holding a small burning object in

their fingers.



c.  Posted July 21, 2020 by the Instagram account @rudeboii_raw —

SHEHABELDIN holding a black suspected Glock pistol, which I was able to

identify through my training, knowledge and experience to include formerly being

certified as a Glock Armorer, and utilizing and manipulating a Glock pistol as a

government issued duty weapon approximately daily since 2012.

11



d. Posted October 9, 2020 – SHEBELDIN smoking suspected marijuana which I recognized based upon my knowledge, training and experience by the manner in which SHEHABELDIN regularly posted via social media, as well as in relation to the contents of the post, which reference the memorial of a deceased associate. I know that SHEHABELDIN and his associates regularly memorialize deceased associates through the consumption of impairing substances, such as marijuana and alcohol and post photos and videos via social media. I know that gang members, such as SHEHABELDIN often post photos and videos of the consumption of illicit substances to gain recognition, credibility of illicit activity and to communicate a sense of power and influence.

26.     On December 16, 2020, I reviewed the search warrant results of the contents of Telephone 3, seized on December 1, 2020. I observed Telephone 3 to have an Apple iCloud account of "montana603@icloud.com" logged in to the phone. I know that SHEHABELDIN's

12

snapchat account is "montana-603". The earliest available media content, other than

conversations, was dated November 14, 2020, the date that Telephone 1 and Telephone 2 were

seized from SHEHABELDIN. I observed the following pertinent content:



    a. A phone conversation between SHEHABELDIN and "Izzy Cruz", dated June 12,

    2019, in which SHEHABELDIN admitted to purchasing a "QP", known to me as

    a Quarter Pound (113.4 grams) every three (3) days and admitting to being a user

    of marijuana;



b.  November 14, 2020 – SHEHABELDIN smoking suspected marijuana (blunt);



c.  November 24, 2020 – A snapchat "snap" from the account "Mosav", depicting

marijuana with the caption, "@montana-603 stfu boy you been smoking peaks". I

14

know from discussions with members of the Manchester Anti-Crime Unit, that

"@montana-603" is the snapchat account of SHEHABELDIN.



d. November 26, 2020 – SHEHABELDIN holding suspected marijuana (blunt)

which I readily identified based upon my knowledge, training and experience. I

know that "blunts" or hand-rolled marijuana cigarettes, are distinct from

commercially purchased tobacco cigarettes and cigars. I observed

SHEHABELDIN's haircut in the photograph to be shorter, similar to photographs

I observed via his public Instagram posts with dates ranging from January 1, 2015

through February 11, 2016, and then again on July 8, 2018, with the shorter

haircut, as opposed to longer hair in more recent photographs;

15



e.  November 29, 2020 – SHEHABELDIN smoking suspected marijuana (blunt);



16



a. November 30, 2020 – Numerous photographs of suspected marijuana;





b. December 1, 2020 – Numerous photos from unknown sources of suspected

marijuana, some of which contained captions regarding sales;





c. Unknown dates – Numerous photographs from unknown sources, suspected to be from snapchat due to the captions, of suspected marijuana.

27.    Based upon my training, knowledge and experience and the fact that SHEHABELDIN had Telephone 1 and Telephone 2 seized from his person on November 14, 2020, I believe those phones were primary devices used by SHEHABELDIN leading up to his arrest. Further, the activation date of November 14, 2020 and the lack of content on Telephone 3 and restricted date range of contents is indicative that Telephone 3 had been recently activated and/or used as a primary device leading up to his arrest on December 1, 2020.

28.    I also know through my training, knowledge and experience that drug users who experience periods of sobriety commonly utilize and express their experiences via social media, and would likely have addiction and sobriety related content, to include but not limited to: social media posts, search histories, GPS data of facilities and conversations. There is no supporting documentation via social media, phone content, previous police interactions or open source information where SHEHABELDIN has reference or been referenced in relation to sobriety.

20

Therefore, I believe the regular aforementioned drug use has been continuous since at least the earlier documentation in April 2017, if not earlier.

29.     Based on the proximity of the electronic equipment to the seized drugs and firearms, SHEHABELDIN and possibly others have used the electronic equipment, including cellular telephones, to participate in and facilitate illegal activity.

30.     In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug use frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs.  These tasks are frequently accomplished through text messages, encrypted messages, and photographs.  Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. Based on my training and experience, I know that persons involved in drugs, to include users, who utilize electronic devices, such as smartphones, frequently replace and exchange the subscriber identity module, commonly referred to as SIM cards (hereinafter, "SIM card"), in order to carry over personal data from one phone to the next, while also preventing operation to a device if removed.

### *Bail Conditions Violations*

31.     On January 7, 2021, I reviewed a copy of SHEHABELDIN's bail conditions set forth by the Honorable Judge Amy Messer of the Hillsborough County, New Hampshire Superior Court – Northern District on December 3, 2020. I learned that SHEHABELDIN was ordered to live at his parent's residence, located at the PREMISES, shall not possess firearms, shall not use any controlled substances, shall comply with a curfew and be at the PREMISES

21

from 9:00 PM – 7:00 AM daily, shall not enter the city limits of Manchester, New Hampshire

other than to attend court hearings, and shall have no contact with a list of DRS[3] gang members

and associates.

32.     I learned from speaking with members of the MPD Anticrime Unit and in review

of MPD report #20-016275, I learned that on December 10, 2020 at approximately 9:10 PM,

MPD officers checked on the whereabouts of SHEHABELDIN at the PREMISES, where he was

ordered by the court to be between the hours of 9:00 PM and 7:00 AM, in compliance with his

bail conditions. I learned that SHEHABELDIN violated his bail conditions at that time for not

being at the PREMISES and arrived after his father and sister contacted him via telephone to

come to the PREMISES. Shortly thereafter, SHEHABELDIN arrived to the PREMISES,

operating a silver 2006 Honda Civic bearing New Hampshire registration 4631030, registered to

Anibelka Arias Carrasco in Manchester, New Hampshire.

33.     I reviewed a copy of an amendment to SHEHABELDIN's bail order that was

granted by the Honorable Judge David Anderson of the Hillsborough County, New Hampshire

Superior Court – Northern District on December 22, 2020. The amendment allowed

SHEHABELDIN strictly to work at the FedEx, located at 44 Industrial Drive, Londonderry, New

Hampshire between the hours of 12:30 AM until 9:30 AM from December 22, 2020 until

January 2, 2021. According to supporting documentation to the amendment provided by

---

[3] DRS, also known as "Da Real Savages", is a Manchester, New Hampshire based street level gang involved in drug-distribution, armed robberies, firearms-related offenses and the use of intimidation and violence in furtherance of their reputation. SHEHABELDIN is known by law enforcement, including the MPD Gang Unit, to be a member of DRS. In addition, SHEHABELDIN self-identifies as a DRS member. For example, his Instagram username is "@drs_ghost".

SHEHABELDIN's lawyer, the temporary employment was as a seasonal package handler with a compensation rate of $15.75 USD per hour, which was payable weekly.

34.     I learned from speaking with members of the MPD Anticrime Unit and in review of MPD report #21-000247, I learned that on December 31, 2020 at approximately 10:22 PM, MPD officers checked on the whereabouts of SHEHABELDIN at the PREMISES, where he was ordered by the court to be between the hours of 9:00 PM and 7:00 AM, in compliance with his bail conditions. I learned that SHEHABELDIN's father and sister contacted him via telephone alert him of the police encounter, to which officers spoke to SHEHABELDIN from his father's cellphone. SHEHABELDIN stated he was working at FedEx at that time, as allowed through the amendment. According to the report, MPD officers were unable to locate SHEHABELDIN at the FedEx in Londonderry, New Hampshire. On January 4, 2021, MPD officers spoke with the Senior Manager of FedEx, who confirmed SHEHABELDIN had not worked on December 31, 2020, and thus violated his conditions of bail.

35.     I learned from speaking with members of the MPD Anticrime Unit and in review of MPD report #21-000257, I learned that on January 6, 2021 at approximately 20:07 PM, MPD conducted a motor vehicle stop on a gray 2014 Honda Accord, bearing New Hampshire registration 4816601, registered to Jessalyn Vargas, within the city limits of Manchester, New Hampshire for operating above the posted speed limit. The operator was identified as SHEHABELDIN, who stated he had just come from an appointment at a hospital. SHEHABELDIN was found to have $2,400.00 in USD currency on his person, however was unemployed since January 2, 2021. Given the known wage SHEHABELDIN received, as well as the number of believed hours SHEHABELDIN worked during his approximately ten-day span of

employment, according to the bail amendment, the money was inconsistent with the earnings of the part-time FedEx position. SHEHABELDIN confirmed with MPD officers that he was no longer employed by FedEx and was unemployed at that time. The money was not seized given the facts at that time. MPD officers had observed SHEHABELDIN at approximately 7:50 PM to be in the company of three DRS gang members within the city limits of Manchester, New Hampshire, all of whom were listed on the bail conditions as persons SHEHABELDIN was not to have contact with.

36.     I know through speaking with members of MPD, and reviewing law enforcement reports and documentation that SHEHABELDIN is known to utilize and have access to numerous motor vehicles, to include:

a.   2016 silver Nissan Altima, assigned VIN number 1N4AL3AP5GC211654, bearing New Hampshire registration 4309800 registered to SHEHABELDIN's father, Gamal Shehabeldin at the PREMISES;

b.   2013 black Dodge Dart, assigned VIN number 1C3CDFBA5DD340239, bearing New Hampshire registration 4836135[4], registered to SHEHBELDIN's alleged step-sister, Jessalyn Vargas in Manchester, New Hampshire;

c.   2014 blue Honda Accord, assigned VIN number 1HGCR2F74EA208906, bearing New Hampshire registration 4816601, registered to Jessalyn Vargas in Manchester, New Hampshire;

d.   2013 brown Nissan Rogue, assigned VIN number JN8AS5MVXDW604082,

---

[4] New registration issued on September 24, 2020, according to the New Hampshire Department of Motor Vehicles. Previously issued registration 4475414, as observed on July 20, 2020.

bearing New Hampshire registration 4209800, registered to Gamal Shehabeldin at the PREMISES;

e.  2015 white Nissan Sentra, assigned VIN number 3N1AB7AP9FY348786, bearing New Hampshire registration 4078990, registered to SHEHABELDIN's sister, Kheloud Shehabeldin at the PREMISES;

f.  As well as rental vehicles, such as those registered to EAN Holdings, which SHEHABELDIN has been observed operating.

37.     I know through my training, knowledge and experience that persons attempting to avoid law enforcement detection will frequently swap and utilize a variety of vehicles readily available to them, to include rental vehicles, not readily registered in their names, in order to not be associated with a particular vehicle and to conceal nefarious or criminal activity.

38.     I learned from members of the MPD Anticrime Unit that directly following the aforementioned bail violations, SHEHABELDIN had exhibited adherence to his bail conditions and has regularly been located at the PREMISES after 9:00 PM.

39.     I know through my training, knowledge and experience that persons, upon being scrutinized of court orders often exhibit brief periods of adherence due to accountability measures put forth against them and being reminded of potential consequences of failing to comply with court orders.

40.     I know through my training, knowledge and experience that persons often utilize modern smartphones and typically have them on or near their persons throughout the normal course of daily activity. I know that persons often keep their smartphone devices and SIM cards with them on their person, inside of their residence and inside of motor vehicles, along with other

25

regularly utilized personal affects.

41.     I know through speaking with members of MPD, and reviewing law enforcement

reports and documentation that SHEHABELDIN is known to utilize and carry multiple

smartphone devices and SIM cards on his person and inside of vehicles he has operated, within

his direct control. I believe it is more likely than not to locate SHEHABELDIN at the

PREMISES after 9:00 PM, especially following a recent violation of his bail conditions. I

believe it is more likely than not to locate Telephone 1 and Telephone 2, and/or SIM cards used

with those smartphones, inside of the PREMISES available to SHEHABELDIN located at the

PREMISES and/or on SHEHABELDIN's person. Because he is required to be on the

PREMISES after 9:00 PM, I respectfully request authority to execute this warrant any time day

or night.

## **TECHNICAL TERMS**

42.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

      telephone) is a handheld wireless device used for voice and data communication

      through radio signals.  These telephones send signals through networks of

      transmitter/receivers, enabling communication with other wireless telephones or

      traditional "land line" telephones.  A wireless telephone usually contains a "call

      log," which records the telephone number, date, and time of calls made to and

      from the phone.  In addition to enabling voice communications, wireless

      telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

28

usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

43.     Based on my training, experience, and research, I know that Telephone 1 and Telephone 2 have the capabilities that allow each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

44.     Based on my training and experience I know that persons involved in drug and firearm related illegal activity, to include drug users, frequent swap SIM cards between readily

available smartphones. I know that the use of multiple SIM cards with one or more smartphones

is used in an attempt to conceal information from law enforcement, such as a person's associated

use with a particular device or a particular phone number or other contact information used

through smartphones, that can easily be changed by swapping the SIM cards.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found.  One

form in which the records might be found is data stored cellphones and SIM cards. Thus, the

warrant applied for would authorize the seizure of electronic storage media or, potentially, the

copying of electronically stored information, all under Rule 41(e) (2) (B).

46.     Based on my knowledge, training, and experience, I know that electronic devices,

including cellphones and SIM cards, can store information for long periods of time.  Similarly,

things that have been viewed via the Internet are typically stored for some period of time on the

device.  This information can sometimes be recovered with forensics tools.

47.     *Probable cause.*  I submit that if cellphones are found on the PREMISES, there is

probable cause to believe that evidence of the listed crimes will be stored on that storage

medium, including cellphones and SIM cards.  Moreover, as further described in Attachment B,

this application seeks permission to locate not only electronically stored information that might

serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the cellphones or SIM cards were used, the purpose of its use, who used it, and

31

when. There is probable cause to believe that this forensic electronic evidence might be on the cellphones/SIM cards because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who

used it, and when, sometimes it is necessary to establish that a particular thing is

not present on a storage medium.

48.   *Necessity of seizing or copying entire storage media.*  In most cases, a thorough

search of a premises for information that might be stored on storage media often requires the

seizure of the physical storage media and later off-site review consistent with the warrant. In lieu

of removing storage media from the premises, it is sometimes possible to make an image copy of

storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the

cellphone's data, including all hidden sectors and deleted files.  Either seizure or imaging is often

necessary to ensure the accuracy and completeness of data recorded on the storage media, and to

prevent the loss of the data either from accidental or intentional destruction.  This is true because

of the following:

a.   The time required for an examination. As noted above, not all evidence takes the

form of documents and files that can be easily viewed on site.  Analyzing

evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises

could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence.  Storage media can store a large

volume of information.  Reviewing that information for things described in the

33

warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers, including cellphones, can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

49.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

34

50.     Because several people share the PREMISES as a residence, it is possible that the

PREMISES will contain storage media that are predominantly used, and perhaps owned, by

persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible

that the things described in this warrant could be found on any of those computers or storage

media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

51.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

Honorable Andrea K. Johnstone
United States Magistrate Judge

35

## ATTACHMENT A

*Property to be searched*

The property to be searched is 72 Whittemore Road, Londonderry, New Hampshire 03053,

including the person of REDA SHEHABELDIN, and the following vehicles registered to 72

Whittemore Road, Londonderry, New Hampshire:

a.   2016 silver Nissan Altima, assigned VIN number 1N4AL3AP5GC211654,

bearing New Hampshire registration 4309800;

b.   2013 brown Nissan Rogue, assigned VIN number JN8AS5MVXDW604082,

bearing New Hampshire registration 4209800,; and

c.   2015 white Nissan Sentra, assigned VIN number 3N1AB7AP9FY348786, bearing

New Hampshire registration 4078990.

Whittemore Road is a housing development on a cul-de-sac road consisting of approximately

thirteen, two story, four or eight-unit buildings of connected townhouse-style apartments. The

buildings are nearly identical wood-framed, brown and gray vinyl sided, with white trim, gabled,

asphalt shingled rooves with green exterior doors. 72 Whittemore Road is located in the second

building on right. Apartment #72 is accessed through the first green exterior door, located on the

northeastern corner of the building with the number "72" in white numbers posted below the

window in the middle of the door.



*Exterior View of 72 Whittemore Road*



*Exterior Views of Building #7 & #72 Whittemore Road Front Door*

## ATTACHMENT B

*Property to be seized*

1.       All records and items relating to violations of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 922(g)(3), involving Reda SHEHABELDIN and occurring on or after April 17, 2017, including:

a.  Records, materials, and information, including communications, relating to firearms, including the acquisition, possession, and disposition of firearms;

b.  Records and information related to use and sources of drugs (including names, addresses, phone numbers, or any other identifying information);

c.  Any information regarding or involving travel to purchase or dispose of firearms;

d.  Records and information related to the location of firearms purchased or possessed by SHEHABELDIN;

2.       Controlled substances, including but not limited to marijuana, and and associated paraphernalia used to store, consume or otherwise conceal drugs.

3.       Firearms and firearms accessories.

4.       Cellphones and other electronic devices used by  Reda SHEHABELDIN, including:

a.  A silver Apple iPhone (unknown model) smartphone (Telephone 1);

    b.  A pink and gold Apple iPhone (unknown model) smartphone (Telephone 2); and

    c.  SIM Cards possibly utilized in conjunction with Telephone 1 and/or Telephone 2.

5.      For any cellphone or SIM card whose seizure is otherwise authorized by this warrant:

    a.  evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    b.  evidence indicating the user's state of mind as it relates to the crimes under investigation;

    c.  evidence of the times the cellphones was used;

    d.  passwords, encryption keys, and other access devices that may be necessary to access the cellphone;

    e.  records of or information about the cellphone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    f.  contextual information necessary to understand the evidence described in this attachment.

2

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).